Pages 1 - 59

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

UNITED STATES OF AMERICA, ex rel.  )
CAMPIE et al.,                     )
                                   )
            Plaintiffs,            )
                                   )
  VS.                              ) NO. C 11-941 EMC
                                   )
GILEAD SCIENCES INC., et al.,      )
                                   )  San Francisco, California
            Defendants.            )  Tuesday
                                   )  October 21, 2014
_____)  2:51 p.m.


TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs/Relators:
                         BONNETT, FAIRBOURN, FRIEDMAN
                            & BALINT, P.C.
                         2325 East Camelback Road
                         Suite 300
                         Phoenix, Arizona  85016
                    BY:  ANDREW S. FRIEDMAN, ESQ.
                         and
                         EVANS LAW FIRM, INC.
                         3053 Fillmore Street
                         No. 236
                         San Francisco, California  94123
                    BY:  INGRID M. EVANS, ESQ.
                         ELLIOT WONG, ESQ.

For Defendants:          COVINGTON & BURLING, LLP
                         1201 Pennsylvania Avenue, N.W.
                         Washington, D.C.  20004-2401
                    BY:  ETHAN M. POSNER, ESQ.

Reported by:             BELLE BALL, CSR #8785, RDR, CRR
                         Official Reporter, U.S. District Court


 (Appearances continued, next page)

**APPEARANCES, CONTINUED:**

**Also Present:**          **UNITED STATES DEPARTMENT OF JUSTICE**
                          **Office of the United States Attorney**
                          **Northern District of California**
                          **450 Golden Gate Avenue**
                          **Ninth Floor, Box 36055**
                          **San Francisco, California  94102**
                   **BY:  SARA WINSLOW**
                          **Assistant United States Attorney**

```
 1   TUESDAY, OCTOBER 21, 2014                        2:51 P.M.
 2                    P R O C E E D I N G S
 3        THE CLERK:  Calling Case CR-11-00941, United States
 4   versus Gilead Sciences.
 5      Counsel, please come to the podium and state your name for
 6   the Record.
 7            MR. FRIEDMAN:  Good afternoon, Your Honor.
 8            THE COURT:  Good afternoon.
 9            MR. FRIEDMAN:  My name is Andy Friedman from Bonnett,
10   Fairbourn, Friedman & Balint.  And I represent the relators in
11   this case.
12            THE COURT:  All right.  Thank you, Mr. Friedman.
13            MR. POSNER:  Good afternoon, Your Honor.  Ethan
14   Posner, along with my colleague Haywood Gilliam (Indicating),
15   for the Defendant in this case, Your Honor.
16            THE COURT:  All right.  Thank you, Mr. Posner.
17            MS. WINSLOW:  And Your Honor, Sara Winslow for the
18   United States, if the Court has questions for the government.
19            THE COURT:  Great.
20            MR. FRIEDMAN:  I shall also point out that my
21   co-counsel Ingrid Evans and Elliot Wong are here as well
22   (Indicating).
23            THE COURT:  Thank you, Counsel.
24      The first question is the question about the sealing of
25   the records.  And I guess -- you know, I have some sense of
```

```
 1   what it is that's been filed under seal, but it's not clear to
 2   me that we are going need to refer with any degree of
 3   specificity to those other than to the general context, but I
 4   have -- I would guess I want to hear from you whether you
 5   still think that we need to seal this hearing.
 6           MR. FRIEDMAN:  Your Honor, I have prepared some
 7   slides which reference some of the sealed exhibits.
 8           THE COURT:  Uh-huh.
 9           MR. FRIEDMAN:  I believe that I can present my
10   argument with general references that will not disclose any
11   purportedly confidential information, but Your Honor of
12   course, and your clerk, if appropriate, can view the
13   information.  It simply will not be part of the record.
14       So I don't believe there will be a need to seal --
15           THE COURT:  And we have the capability of having just
16   my monitor and the clerk's monitor without the public monitor.
17           MR. FRIEDMAN:  And Your Honor, when I said "slides,"
18   actually it's printed documents.
19           THE COURT:  Oh, oh, oh.  I thought you were going to
20   put it on the ELMO or something.  Okay.  So one thing we can
21   do is proceed until and unless we get to a point where we
22   start to get into some specifics, at which point I can take
23   action to seal.
24       Do you have a different view?
25           MR. POSNER:  No, Your Honor.  I intend to refer to
```

```
 1   the exhibits; they support our motion to dismiss.  I think I
 2   can probably do that -- I mean, from my perspective I think I
 3   can probably do that in a way at that protects the
 4   trade-secret and confidential information.  Obviously, I don't
 5   know how Plaintiffs' Counsel is going to proceed.
 6        I am planning on discussing the exhibits at some length,
 7   but believe that I can do so for purposes of this hearing in a
 8   way that navigates around the issues we have been talking
 9   about.
10        THE COURT:  All right.  Why don't we try to proceed
11   on that basis.  And then, you know, if we start to get into,
12   of necessity, some details that are matters under seal then we
13   can take action at that point.  I'll leave it to you to alert
14   me if we get into that danger zone.
15        I'm, frankly, kind of more interested -- I guess you have
16   a detailed factual presentation you want to make.  But I'm
17   kind of more interested in some of the general legal
18   principles, particularly, you know, the -- the cases, the
19   Hendow, the Ebeid, the Omnicare cases, and the whole question
20   about what happens when alleged misrepresentations are made to
21   the FDA; can you fashion an FCA claim out of that?
22        I don't know if that requires us to get into the -- too
23   much into the weeds because there are some larger legal and
24   policy implications that -- that's the first thing I want to
25   attack.  I think those --
```

1          **MR. POSNER:**  Would you like me to be in there,

2     Your Honor?

3          **THE COURT:**  Yeah, but let me just -- let me tell you

4     some initial thoughts and questions that I have, and then you

5     can respond to it.

6          **MR. POSNER:**  (Nods head)

7          **THE COURT:**  First of all, you know, the paradigm

8     cases we all know is where there is a miscertification,

9     misrepresentation to the payor, to the paying agency.  And in

10    large part I think that's what *Hendow* and *Ebeid* and most of

11    those cases are -- almost all of the cases are along those

12    lines.

13         As I understand it, there is a strain of that here.  I

14    want to put that aside.  I'm not talking about worthless goods

15    and that -- that's kind of a second tier.  But the first

16    question, the first question is stemming from the alleged

17    misrepresentations to the FDA to get approval or to avoid

18    recall or some other remedial action, which then sequentially

19    led to the selling of these drugs, basically, to Medicare,

20    Medicaid, VA, et cetera.

21         That, at least in the main, seems to involve an alleged

22    misrepresentation or omission made to kind of like a licensing

23    agency, a gatekeeping agency, which then leads to a

24    transaction in which money is paid to the party that engaged

25    in the misrepresentation.

1    So there is a different chain of events here, which gives

2    rise, as *the Omnicare* case points out, to a host of sort of

3    legal questions, factual questions, and policy questions.

4    And, one of those is that I don't think it's disputed.

5    And I think in the *Hopper versus Anton* case, there's a

6    statement about the false-certification theory, that you have

7    to show the false statement caused the government to make a

8    payment.  I don't think that's a novel concept.  I think it's

9    clear.

10    And so when a misrepresentation that is a *sine qua non* of

11    a payment is made directly to the paying agency, there is not

12    much of a question of causation.  I mean if it's a requirement

13    and representation was made, it was false, I think one can

14    fairly assume that the government would not have paid under

15    those circumstances.

16    But here, there's a chain of causation that is a little

17    tricky because it's like, well, had the FDA known about these

18    various issues and violations and misrepresentations, the FDA

19    might not have approved the drug, might have recalled the

20    drug, may have taken it off the market, may have done

21    something which then would have resulted in the non- -- in the

22    transaction or not -- resulted in a non-transaction, and

23    therefore, non-payment to Gilead.

24    The problem I have there and I think the problem that

25    perhaps bothered the Fourth Circuit is that:  Well, how do we

1   know?  Given the range of remedies and things that the FDA can

2   do, short of a recall, short of a denial, there are lots of

3   other remedial steps, perhaps.  Or they might find that it

4   wasn't material enough to prevent the actual approval of the

5   drug.

6       How do we know in that chain of causation what the FDA

7   would have done?  Seems to me what the FDA does is in one of

8   those links in that chain.  And how do we know that, and how

9   is that going to be proven if we get to a trial?

10      Do we have to put on the administrator or the FDA, or

11  experts from the FDA?  And say, "Well, had we known this, we

12  probably would have, rather than suspending the process, or

13  calling for further investigation or putting -- requiring

14  different quality control things, we would have taken it off

15  the market"?  Or whatever.  How do we know that?

16      That's what I think bothered the Fourth Circuit, is that

17  this chain of causation is not directly "I lied to you and you

18  paid."  Now it's like "I lied to you, and then you let me go,

19  so then that led to my payment eventually."

20      And when that third party is a complicated regulatory

21  scheme, that I don't know how we would determine sitting here

22  as an FCA court, what would have happened.  That's the core of

23  the problem that I see with that claim.

24          **MR. FRIEDMAN:**  Your Honor, may I hand up the

25  documents, because I may need or want to refer to them as I

1    answer Your Honor's question?

2              **THE COURT:**  Yeah.  Yeah.

3        (Document handed up to the Court)

4        **MR. FRIEDMAN:**  Your Honor, if I might, before I get

5    to *Omnicare* I would like to start with the Ninth Circuit law

6    in *Hendow*, which I think provides the most closely analogous

7    scenario.  The other cases in the Ninth Circuit really don't

8    deal to any extent with the analytical framework.  And, there

9    are three aspects to *Hendow*, I think, that help answer

10   Your Honor's question.

11       Defendants repeat over and over again that false

12   certification -- in a false-certification case -- and in this

13   case we have alleged claims both under the false-certification

14   theory and the promissory-fraud theory, and they say that *sine*

15   *qua non* or the requirement that it be a condition of payment

16   is somehow controlling.

17       We don't dispute that there is language to that effect in

18   Ninth Circuit cases.  But what *Hendow* explains is how that

19   applies in a case like this.  As Your Honor knows, the

20   Defendant in *Hendow* was the University of Phoenix.  And, the

21   relator was a former enrollment counselor at the University of

22   Phoenix.  And the relator alleged that the defendant in that

23   case violated the ban on incentive compensation for providing

24   compensation based upon a number of recruits or students

25   enrolled.  And, the claims for payment in that case were made

1   under the Title IV, the Pell grants, and under the federal

2   family education loan program.

3        Importantly, there was no allegation in *Hendow* that the

4   defendant made false certifications or false statements in the

5   claims for payment.  Because in many instances, the claims for

6   payment were being made by students who applied for loans, and

7   not by the defendant, itself.

8        So, contrary, Defendants' assertion as a starting point,

9   the actual claims for payment in *Hendow* were not, themselves,

10  expressly conditioned on compliance with federal statutes.

11       Instead, the governing statutes in *Hendow* established

12  incentive compensation ban a condition the university's

13  participation in the programs, on compliance with the

14  incentive compensation ban.

15       And the statute and the regulations nowhere expressly

16  state that payments or funding were conditioned upon

17  compliance with incentive compensation ban.  Rather, the

18  statute said only that the university had to sign an agreement

19  that would condition its participation in the program upon

20  compliance with the rules prohibiting incentive compensation.

21       And, the regulations said the same thing.  Neither of them

22  expressly conditioned payment upon compliance with the

23  incentive-compensation ban.  Nor did the participation

24  agreement that the university signed.

25       So --

1      **THE COURT:**  I thought you couldn't participate if you

2 violated that ban.

3      **MR. FRIEDMAN:**  That's correct, Your Honor.  And the

4 defendant in that case made the argument -- much -- much like

5 Defendant in this case -- that the applicable statute, in

6 regulation and agreement, did not expressly condition payment,

7 but --

8      **THE COURT:**  But participation.

9      **MR. FRIEDMAN:**  But rather, participation.

10      **THE COURT:**  And that's a distinction without a

11 difference.  I understand that.  But still, maybe you can

12 conflate those two there, but that doesn't answer my question.

13      **MR. FRIEDMAN:**  Well, Your Honor --

14      **THE COURT:**  When the statement is made to a third

15 party, whether you call it a participation condition or

16 payment condition, that's where there's a difference between

17 this case and all the Ninth Circuit cases.

18      **MR. FRIEDMAN:**  But, Your Honor, in *Hendow*, the Court

19 said three things that are critically important.

20    The first thing the Court said is that in looking whether

21 a certification is a *sine qua non* of payment, the question is

22 this:  The conditions in that case, meaning participation --

23 and this is on Page 4 of Your Honor's booklet (As read):

24          "These conditions are also 'prerequisites' and 'the

25          *sine qua non*' of federal funding for one basic

1                reason:  if the Defendant had not agreed to comply

2                with them, it would not have gotten paid."

3       So that's one critical point that is established by

4  *Hendow*.  In looking whether there's a prerequisite to payment,

5  the Court looks to the -- if the Defendant would not have made

6  the certification or made the agreement, would they have

7  gotten paid ultimately.  Took a very practical view.

8       So, as long as the Defendant's ability to ultimately

9  receive payment depends upon compliance with a statute

10  regulation, compliance with that is considered in the Ninth

11  Circuit under *Hendow*, Your Honor, I believe, to be a

12  prerequisite or *sine qua non* to payment.

13       The second thing --

14       **THE COURT:**  What about if a corporation like the

15  University of Phoenix has a deal with the government,

16  performing some government contract, and one of the

17  requirements is that they maintain good standing with their

18  state corporate secretary, otherwise they can't operate?  And

19  they fail.  For whatever reason, they commit some kind of

20  violation, don't pay their right fees, or at least they make

21  some kind of representation at stake about who's on the board,

22  or whatever it is, that's false.

23       They're able to maintain their good standing and their

24  ability to conduct business, but under false pretenses.  And

25  yet, they contract with the Federal Government.  And the same

```
 1   argument:  They wouldn't have been able to participate; had

 2   they told the truth, they would have been not allowed to

 3   conduct any business in the state, wouldn't be able to exist.

 4            MR. FRIEDMAN:  That's right, Your Honor.

 5            THE COURT:  Is that the same thing?  Is it still a

 6   condition of participation?  If they hadn't lied, they

 7   wouldn't have been able to participate?  Same kind of

 8   causation chain?

 9            MR. FRIEDMAN:  Well, two other things in Hendow --

10   and then I'll turn specifically to this case -- and why the

11   facts of this case fall within Hendow were that the Court also

12   recognized, given the broad intended reach of the False Claims

13   Act, in addition to saying that if the defendant would not

14   have agreed to the condition, they wouldn't have been paid,

15   the Court also says it's a question of causation, I think as

16   Your Honor put your finger on.

17       And the Court says -- and this is on Page 5 of the

18   booklet -- that (As read):

19            "The False Claims Act requires 'a causal rather than

20            a temporal connection between fraud and payment'...if

21            a false statement is integral to a causal chain

22            leading to payment, it is irrelevant how the federal

23            bureaucracy has apportioned the statements among

24            layers of paperwork."

25       So, again, the Court in Hendow looks at it as a question
```

1    of causation in that respect, too.  And it looks to whether

2    the certification was, in fact, a causal link in the chain of

3    causation, ultimately to payment.

4        And the third thing that the Court said in *Hendow* which is

5    particularly apt here is it rejected the notion that in a

6    Medicare/Medicaid context, some explicit requirement of a

7    condition of payment be made.

8        And that's Page 6, Your Honor, of the booklet.  And what

9    the Court said there is that (As read):

10           "An explicit statement...is not necessary to make a

11           statutory requirement a condition of payment, and we

12           have never held as much."

13       Those three principles applied here, Your Honor, show

14   exactly why the false certifications that were made in this

15   case and the false representations that were made in this case

16   qualify for treatment under the False Claims Act.

17           **THE COURT:**  Well, the causal chain is one that

18   interests me, because I start off with that.  And that is in a

19   case like *Hendow*, the causal chain is not hard to glean.  You

20   cannot have this financial incentive, you know, incentivize

21   recruiters, et cetera, et cetera.  Otherwise, you're out.

22           **MR. FRIEDMAN:**  Right.

23           **THE COURT:**  In this case, I understand the allegation

24   that the FDA would not have approved the drug, had it been

25   known of the various violations alleged of Gilead.  But the

1   comeback to that is:  Well, it's a little more complicated

2   than that.  It's not just a one-dimensional, on-off, zero-one,

3   you know, kind of digital on-off.  There are a variety of

4   things that could have happened.

5       Had some of these things in the hundreds of pages of the

6   complaint -- maybe some of those would have led to recall or

7   disqualification of the drug, or non-approval.  Maybe some of

8   them would have led to some other action.  Some delay or

9   something else.

10      I've had many cases -- I've had securities-fraud cases

11  involving FDA action on pharmaceutical labs where, my God, it

12  took years, you know, to issue certain letters, and warning

13  letters, and they got remedial action, and blah, blah, blah.

14  To me, it seemed like it took forever.  And they continued to

15  sell the drugs, notwithstanding iron filings and everything

16  else in the drug.

17      So, how do we know that that causal chain which is so

18  obvious, so direct, so plain in *Hendow* would have applied

19  here?

20      And I ask that question sort of rhetorically, because that

21  raises the question of where that causal chain goes through

22  into a bureaucratic box that's complicated, that's

23  multi-pronged, and that's wide and deep that suggests:  Well,

24  maybe the FCA is not the proper venue.

25          **MR. FRIEDMAN:**  But, Your Honor -- and I'll go back to

1    the causation issue, and show you exactly why the

2    false-certification theory and the promissory-fraud theory are

3    aptly applied in this case.

4        But the short answer to that question is that under the

5    four-part test in *Hendow*:  Requires a false statement, made

6    with scienter, that is material, that leads to -- ultimately

7    to payment.

8        And materiality under the False Claims Act is not judged

9    based upon whether the government would or would not have

10   actually approved a given drug or a particular facility.  The

11   test for materiality under the False Claims Act, both in the

12   statutory language and in *Hendow*, is whether the certification

13   or false statement had the tendency to influence the

14   government's decision, or the capacity to influence the

15   government's decision.  Not what the government's decision

16   ultimately was in the particular case.

17       So --

18           **THE COURT:**  Which decision?  Tendency to influence

19   the payor's decision to pay?

20           **MR. FRIEDMAN:**  Well, it depends on which stage of the

21   causal chain you're going to.

22           **THE COURT:**  Do you have any case that suggests that

23   it's the mere tendency to influence the gatekeeper which then

24   leads to the payor -- eligibility to go to the payor?

25           **MR. FRIEDMAN:**  Well, the same thing is true in the

1    *University of Phoenix* case.  There was no -- the point here is

2    the -- there's certifications that are required under the

3    statutory scheme for introduction of the new drug, and for

4    introduction of the new facility.

5         And if you turn to Page 10, I've tried to show that

6    progression in the causal chain that ultimately applies here.

7    You have the new drug application which results, if it's

8    granted, in approval of a new drug.

9         You have Synthetics China -- we use that as an example

10   because that's -- much of the complaint is devoted to the

11   Chinese facility that was not registered that they had the

12   tainted API -- active pharmaceutical ingredient -- produced

13   at.

14        (Reporter interruption)

15             **MR. FRIEDMAN:**  "Ingredient."

16   The manufacturing process, and the introduction into

17   commerce.

18        If you flip the page to 11, you'll see that we allege and

19   there is evidentiary proof referenced in the complaint that

20   there were false certifications made at every stage in that

21   process, leading to the introduction into commerce of the

22   tainted pharmaceuticals.

23        There was a false certification that was made in

24   connection with the new drug applications.  There were myriad

25   false certifications that were made when Gilead was seeking to

1    qualify Synthetics China to move the manufacturing process

2    there.  And there were false certifications made in connection

3    with the manufacturing process.

4        The FDA, the statutes, and regulations at each step say

5    that you have to comply with the GMP standards, and you have

6    to certify compliance with those standards as a precondition

7    to introducing the drugs into the market.

8        So, if you turn -- those statutes are described at Page 12

9    with respect to adulterated drugs.  But if you look at Page

10   13, what you have is an example of an express certification by

11   Gilead at the new-drug-application stage.  And there, they

12   both certify and agree that they will comply with all

13   applicable laws and regulations, including the good

14   manufacturing practices that were violated here.

15       And we allege and provide evidentiary proof that at the

16   time those certifications made, they were false.  If those

17   certifications were not made because they could not truthfully

18   be made, because Gilead had no intention to comply with the

19   manufacturing processes, then they're out of the box.  They

20   could -- as a matter of law, they could not apply, so it's not

21   a question of whether the FDA would have approved it.

22       If they hadn't given the certifications because they're

23   false, they could not have introduced the drug into commerce,

24   it would not have been a covered drug under Medicare, and they

25   would not have been paid.

1    So, it's not a question of whether, had they disclosed a

2    particular subsequent violation, the FDA would have taken some

3    different action.  Here, at the outset, at the get-go, they

4    have to give that certification, which was false.

5    The exact same thing is true, Your Honor, with respect to

6    the Synthetics China plant.

7         **THE COURT:**  When you say "false," it says:

8         "I agree to comply with all..."

9         "I agree to comply."

10   That's a promise of what they will do.  Right?

11        **MR. FRIEDMAN:**  Correct.

12        **THE COURT:**  It's prospective.

13        **MR. FRIEDMAN:**  At that point, it is.  But look at

14   Synthetics China, which is a critical link in this process.

15   With Synthetics China, again, when they decided they

16   wanted to move to a cheaper Chinese facility which was

17   unregistered, Section 356a of the United States Code required

18   that before they can distribute the drug, they have to

19   validate that it has the same quality, strength and purity as

20   the NDA-approved drug from the existing manufacturing process.

21   The regulations are to the same effect.

22   And, on Page 15, it just is guidance, it's a public record

23   from the FDA that makes it clear that that that

24   (Unintelligible) apply in the situation that we have here.

25   When Gilead was going to move to this Chinese facility, a new

1    manufacturing plant, that kicked in the requirement that they

2    demonstrate through validation testing that this new plant

3    would be able to produce product with the same purity as had

4    been approved in the NDA, the new drug application.

5        **THE COURT:**   How do we know what the FDA would have

6    done?

7        Let's say they found out sooner.  Before allowing the

8    manufacture and distribution, they then learned that:  Well,

9    wait a minute, they've been using Synthetics China before we

10   approved or before this was brought to our attention.

11       How do we know what the FDA would have done then?

12       **MR. FRIEDMAN:**   Well, what happened, though,

13   Your Honor, is that they were required to file a document with

14   the FDA called a "Prior Approval Supplement," a PAS.  Which

15   means in order to demonstrate the capacity of this Chinese

16   facility to produce API with the same purity and strength,

17   they had to submit a given -- a new document.  And they did

18   that.

19       And if you turn to Page 16 -- and again, I need to be a

20   little careful here so I don't run afoul of the sealing order.

21   But specifically Pages 16, 17, and 18, what the documents show

22   is that in connection with this requirement -- again, it's not

23   a question of whether the FDA would have approved the Chinese

24   plant based upon what subsequently came to light, but when

25   they submitted the PAS for Synthetics China, they lied.  They

said that the test results showed that it was the same purity

and strength as the preexisting facility's.

They submitted falsified test results in which, again,

without going into the details, they certified that these test

results did not show contamination, when in fact, the real

test results did.  And they certified on Page 18, once

again -- this is a document by the way, Your Honor, from the

FDA website.  We have the actual one signed by Gilead.

But, the key is the certification.  It's the same

certification.  They certified that they would comply with the

good manufacturing processes, and that the information

submitted to gain approval for the plant was, in fact,

accurate.

But that wasn't the case.  They had no present intention

to comply with the good manufacturing practices because they

knew, based upon the test results, that they could not, would

not, did not qualify.  So what you have here is not only a

false express certification, but you have one that is false at

the time it is made.

We're not talking about prospective actions, as Your Honor

was concerned about.  You're talking about the results of the

tests they were required to conduct, as a requirement to

distribute one capsule of this product.  It was a

presently-false statement that's relevant not just to the

false-certification theory, but it's relevant to the

1    promissory-fraud theory.

2        It's one thing, Your Honor, to say:  We intend to comply

3    with these requirements.  It's quite another thing to say --

4    to lie, and say: We are in compliance; here are the test

5    results to certify compliance with these practices, when they

6    know that they did not comply.

7        It's not a question of what the FDA would have done when

8    they finally decide -- determine there's contamination.  They

9    could not file this application.  They could not file the

10   certification, because it was false.

11       And that's exactly the case, going back to *Hendow*, that's

12   presented in *Hendow*.  What the Court said in *Hendow* was the

13   condition of payment or participation was that they had to

14   file -- they had to certify -- actually, it wasn't even

15   certification, it was simply an agreement, that --

16   acknowledging the incentive-compensation ban.

17       Here, what you're talking about is at the moment -- not

18   only are they required to give the certification, but the

19   certification given is false when made.  That's why it doesn't

20   -- we're not going to get into what the FDA would have done.

21       What we're saying is that you can't qualify yourself to

22   participate in, ultimately, Medicaid and Medicare, by falsely

23   certifying to the FDA that you are in compliance and will be

24   in compliance with very strict manufacturing standards, when

25   your own test results show that you're not in compliance, and

1    that that plant didn't have the capability of complying.

2         With respect --

3              **THE COURT:**  So, had they truthfully -- had they been

4    truthful, according to your view, they couldn't and would not

5    have certified, signed this certification --

6              **MR. FRIEDMAN:**  Correct.

7              **THE COURT:**  And therefore, without certification, no

8    approval.

9              **MR. FRIEDMAN:**  Correct.

10             **THE COURT:**  No discretion.

11             **MR. FRIEDMAN:**  Correct.  This is not a question of

12   substituting a jury's discretion for the FDA's.  This is a

13   question of their -- they can't file the certification that is

14   required, because what they did was lie.  But, had they not

15   lied, they could not file -- they couldn't have given the

16   certification.

17        And if they went to the FDA and couldn't give that

18   certification, they can't -- under the statutes and the rules,

19   they can't sell any of these drugs.  That's the critical

20   point, Your Honor.

21        And, with respect to materiality, I would simply point

22   Your Honor to the fact that the statutory standard for

23   materiality is whether it has within the false claims statute

24   -- is whether it has a tendency or the capability of impacting

25   a decision by the government.

1    And a decision -- in the case law, a decision is not

2  necessarily simply to pay.  It's a decision whether to confer

3  a benefit.  And, here, the benefit, of course, is FDA approval

4  of the product and the plant, which are absolutely required to

5  sell the product and get paid.

6    Another case within the Ninth Circuit --

7         **THE COURT:**  Wait; say that again?  I thought the --

8  I'm not sure I caught that last point you were making.

9         **MR. FRIEDMAN:**  Okay.

10         **THE COURT:**  Say that again.

11         **MR. FRIEDMAN:**  If you look at Page 22, which is a

12  quote from *Hendow* on materiality, there's a statutory

13  standard, as I mentioned, which looks at whether it has a

14  tendency or the capacity to influence the government.

15    But what they say in *Hendow* is that (As read):

16         "...the question is merely whether the false

17         certification -- or assertion, or statement -- was

18         relevant to the government's decision to confer a

19         benefit."

20    What was the benefit that was actually being conferred in

21  *Hendow*?  It was eligibility to participate in the program, and

22  ultimately receive payments.

23    What is one of the benefits that is being sought here?

24  It's FDA approval to sell the product, which is absolutely

25  necessary in order to gain payment.

1       If Your Honor would look at the *Amphastar* --

2           **THE COURT:**  Well, we have a disparity between the

3   benefit giver and the payor in this case that didn't exist in

4   *Hendow*.

5           **MR. FRIEDMAN:**  It didn't.  But look, for example, at

6   the *Amphastar* case, which is a recent case from the Central

7   District, which Defendants do not address or deal with in

8   their papers.  That was a case involving off-label use of

9   pharmaceuticals.

10      I'm sorry; the *Amphastar* case was a challenge, a patent

11  case.  It was a challenge by a competitor to a patent granted

12  to the defendant.

13      And the false claim in that case, the false statement was

14  made to the patent office, to secure a patent.  That patent

15  then allowed them to sell their drugs and get payment from the

16  federal government under Medicare and Medicaid.

17      The allegation was that the patent was issued based upon

18  false assertions to the Patent and Trademark Office.  And that

19  led to the issuance of a patent, which then allowed the

20  defendant, according to the plaintiff, to charge inflated

21  prices for their product.

22      So there's a case in which the false statement is being

23  made to one agency, the patent office.  The payments are being

24  made, as in this case, by Medicare and Medicaid.  And the

25  judge in that case sustained the complaint, applying *Hendow*

1   and Ninth Circuit precedent.

2       So it's not a one-off case where there is a disparity

3   between the agency to whom a false certification is submitted,

4   and the payor, the agency ultimately making the payment.

5       With respect to --

6           **THE COURT:**  I can see one difference.  And that is:

7   When the patent office acts, it either grants PATENT or

8   doesn't.  Ultimately.  I understand there are interim steps.

9           **MR. FRIEDMAN:**  Well --

10          **THE COURT:**  It's a little more complicated when you

11  are talking about what to do -- you know.  Let's say the truth

12  is learned about after the drug has hit the market, in terms

13  of the decision to recall or not.

14          **MR. FRIEDMAN:**  Well that's -- again, that's a

15  subsequent decision, Your Honor.  If you look at it at the

16  critical point, which is the time that they're conferring the

17  approval, just like granting a patent --

18          **THE COURT:**  Aren't some of the allegations

19  post-approval?  Failure to comply with GMP and some other

20  things post-approval?

21          **MR. FRIEDMAN:**  There is conduct that is post-approval

22  that is used as proof.  But --

23          **THE COURT:**  At least some of those get into the more

24  complicated question of what would the FDA done, had it known.

25          **MR. FRIEDMAN:**  Again, because of the all-or-nothing

 1   approach that Defendant took in this case, we didn't get into

 2   every single aspect of -- every single claim that is alleged.

 3   I'm focusing on Synthetics China because that is a large part

 4   of it.

 5       But with respect certainly to Synthetics China, again, the

 6   FDA -- there would be no approval, just as there would have

 7   been no patent application, if -- unless the certification was

 8   made, and the certification was false when made.

 9       *Omnicare*, Your Honor, I submit, is far, far afield from

10   this case for several different critical reasons.  Of course,

11   *Omnicare* is a Fourth-Circuit case, not a Ninth-Circuit case.

12       But, the difference in *Omnicare* is it's completely at odds

13   with this case.  In *Omnicare* there was no allegation that the

14   Defendant made an express false certification at the outset,

15   made an implied certification, or any false statement,

16   whatsoever.

17       Here's what the District Court said in describing what the

18   relator in *Omnicare* did not do.  And, Your Honor, it's at Page

19   14, it's a Westlaw citation.  It's at Page 14 of the Westlaw

20   citation.  And I quote it because I think it's an absolutely

21   critical distinction between *Omnicare* and the case we're

22   dealing with here.

23       What the Court says in *Omnicare* is, and I quote --

24           **THE COURT:**  Are you quoting from the Fourth Circuit

25   or from the District Court?

1        **MR. FRIEDMAN:**  This is from the District-Court

2    decision, which will be -- which is ultimately carried forth

3    into the Fourth-Circuit decision, although the Fourth-Circuit

4    decision is not as clear on the factual claims that are being

5    made.

6        But --

7        **THE COURT:**  Well, that's less important -- frankly,

8    when an Appellate Court speaks, the fact are as they tell them

9    to be, not -- that's the basis of the precedent.

10        **MR. FRIEDMAN:**  I understand.  I'll tie the two

11    together for Your Honor.

12        But, what the District Court said was that, quote

13    (As read):

14            "In sum, Relator does not argue there was an

15            affirmative false statement or false certification.

16            Relator does not argue this Court should adopt the

17            implied certification theory, and Relator does not

18            argue the theory of fraud by omission."

19        So, and the Fourth Circuit picks up on that, because what

20    the Fourth Circuit says ultimately in *Omnicare* is, and its

21    holding is that (As read):

22            "We conclude that once a new drug has been approved

23            by the FDA and qualifies for reimbursement, the

24            submission of a reimbursement request for that drug

25            cannot constitute a false claim under the FCA on the

1          sole basis that the drug has been adulterated."

2      What happened in *Omnicare*, Your Honor, is this is the case

3  where they had two operations.  One was a repackaging

4  facility, where they were repackaging drugs for sale in bubble

5  packs so that elderly folks would receive a dosage that was

6  necessary.

7          **THE COURT:**  No, yeah, I understand that.

8          **MR. FRIEDMAN:**  And there was no allegation in

9  *Omnicare* that the defendant had submitted a false

10 certification to gain approval of the facility at the

11 inception.  The only allegation in *Omnicare* was it turned out

12 that they didn't comply with the manufacturing standards.

13     And what the Court said in the Fourth Circuit was, "Look.

14 If all you have is the fact that ultimately there was a

15 regulatory violation, that's not the stuff of which false

16 claims are made."

17     But it's much different here, where what we allege is

18 these certifications and agreements that were made on day one

19 to allow the product to be sold were false, when made, and

20 demonstrably so.

21     We have the documents.  They are exhibits to the

22 complaint, showing that those statements were false when made.

23     Furthermore, the Fourth Circuit in *Omnicare* doesn't even

24 recognize implied certification theory whereas the *Ebeid* case

25 adopted that theory in the Ninth Circuit, which may explain

1   why the relator didn't try to make the argument.

2       And to the extent that Defendants read *Omnicare* is as

3   expressly -- as requiring the Medicaid or Medicare statutes to

4   expressly condition payment on compliance with federal

5   statutes, that's at odds with *Hendow*.  And Page No. 6, where

6   the Court specifically said that there is no requirement of an

7   explicit statement pre-conditioning compliance.

8       So I would say, Your Honor, that *Omnicare*, apart from the

9   fact it's out of this circuit, the critical distinction is

10  there was no allegation of a false certification that was

11  false when made at the inception that would give rise to

12  either a false certification under the express or implied

13  false-certification theory, or a promissory-fraud theory.

14      The relator could not allege and did not allege in

15  *Omnicare* that the defendant in that case was able to open the

16  facility on day one, based upon a false statement,

17  representation or certification.  It was something in

18  happenstance that after the fact, there was there was a

19  violation.  There were not rampant violations the very day

20  that the facility doors were opened, and there was no

21  allegation of certification.

22          **THE COURT:**  You've been patient.  Let me hear the

23  response, please.

24          **MR. POSNER:**  Thank you, Your Honor.

25      Well, look.  Your Honor's, I think, initial instincts were

```
 1   correct.  Obviously, there have been some courts that have

 2   struggled with this, and they have all dismissed these kinds

 3   of cases.  The District Court in *Omnicare*, the Court of

 4   Appeals, even the *Alcon Labs* case in cert was denied, and

 5   *Omnicare* recently.  I think all the cases --

 6           **THE COURT:**  Not the District Court in the *Amphastar*

 7   case.

 8           **MR. POSNER:**  Well, actually, yes.  I was going to get

 9   to the *Amphastar* case.  Actually, that case was dismissed.

10   The relator's counsel, for some reason, said they sustained

11   it.  I'll read from the case here.  And, actually, the

12   *Amphastar* case actually shares a failing with this case.

13   Okay?

14      One of the remarkable aspects of this case, Your Honor,

15   you're correct that the Ninth Circuit cases involve

16   misstatements to the payors.  And what it also means is that

17   those cases involved the contract between the payor, or the

18   claim form, or the agreement, or the regulations about

19   compliance.

20      Well, here, it is undisputed that neither the Medicare

21   program nor the Medicaid program or any direct sales of these

22   life-saving medicines to the United States government requires

23   compliance with the manufacturing processes as a material

24   precondition of payment.

25      How do I know that?  Well, I know that in part because
```

1    *Omnicare* held that.  But I also know that, more importantly

2    for this case, because the relators concede that.  And the

3    reason they concede that is because we do not have before the

4    Court the Medicare participation agreement, the Medicaid

5    participation agreement.

6        They allege all these sales to the government of the

7    United States of America.  And they have not produced a single

8    contract.  And they have conceded that in none of those

9    agreements or regulations or laws that there is any

10   requirement to comply with the manufacturing processes that

11   are alleged to have been violated.

12       And, what the Ninth Circuit cases -- and the *Amphastar*

13   case -- just to finish this, the *Amphastar* case didn't have

14   that either, and that's why the Court threw the case out,

15   because the Court found Amphastar supplied no representative

16   examples of false claims, they didn't provide the contracts,

17   they didn't provide the basic agreement documents that would

18   even allow you to determine materiality.

19       *Hendow* is an easy case, Your Honor, because the agreement

20   that the Court was considering was the agreement with the

21   payor.  "I will sign an agreement with you, the payor.  Here

22   is my participation agreement.  Here is my contract with you."

23       And the Court noted in *Hendow* that the agreement, as well

24   as the statute, as well as the regulation, all expressly

25   conditioned not just participation, but payment.  And I am

1    quoting repeatedly from *Hendow* on the precise requirement the

2    Defendant was alleged to have violated.

3        So, the *Ebeid* case, decided after *Hendow*, says the case --

4    the cases all impose material precondition of payment,

5    Your Honor.  They may speak slightly differently, but that's

6    the rule that everybody is applying here.  That's the rule

7    that the Fourth Circuit imposes, and that's the rule that

8    *Ebeid* imposes, *Hendow* imposes, and of course, *Hopper* imposes.

9        And in fact, both *Hopper* and *Ebeid* --

10           **THE COURT:**  The rule being what?

11           **MR. POSNER:**  Being that, you know, what you need --

12    the -- the -- the false representation or certification.  And

13    I'm not putting any talismanic significance on the word

14    "certification." But the false statement in question,

15    Your Honor, has to be a material precondition to payment.

16        That is the rule that flows through all of these cases.

17    It flows through *Omnicare*, and it flows through three

18    Ninth-Circuit cases.  That's why *Hendow* is an easy case to

19    decide.  Because, *Hendow*, they had a statute, a requirement,

20    and the contract between the parties (Indicating).  That

21    explicitly --

22        (Simultaneous speakers)

23           **THE COURT:**  -- a material precondition of payment is

24    that you have a valid drug.

25           **MR. POSNER:**  Well --

1          **THE COURT:**  Validly approved.

2          **MR. POSNER:**  Your Honor, the reason we have the

3    material-precondition-to-payment rule, of course, is to

4    distinguish between fact patterns that go to claims for

5    payment -- which the False Claims Act is limited to,

6    obviously -- and an array of other regulatory issues that the

7    government can deal with separately.

8          And that, that issue, Your Honor, is a factor in

9    determining materiality.  Both the *Hopper* case -- and even in

10   *Hendow*.  Obviously, *Hendow* distinguishes the Medicare context.

11         And Your Honor is already familiar:  What are the other

12   enforcement tools that the United States has at its disposal

13   here?

14         Your Honor is familiar with a number of them:  Consent

15   decrees, warning letters, inspections, recalls, potential

16   criminal liability.  The United States has an array of

17   remedies.

18         That's why the courts impose this gatekeeper

19   material-precondition-to-payment rule, to limit claims under

20   the False Claims Act.  Because the claims, the statements have

21   to relate to reimbursement or payment.  They have to be

22   material preconditions to payment and reimbursement.

23         So let's talk about -- because otherwise, obviously,

24   Your Honor, we would be in this limitless morass of looking at

25   every statement to the FDA involving drug approval, or

```
 1  post-approval, or inspections or recalls.  And a relator is
 2  going to say, "Ah, you lied there; you made a
 3  misrepresentation; that's a violation of the False Claims
 4  Act."
 5      And the reason the courts impose this gatekeeper in the
 6  first place is to distinguish between material preconditions
 7  to payment and, obviously, other statements to the FDA that
 8  can be dealt with in an array of other ways.
 9      All right.  Now, there are several reasons why allegations
10  that the FDA was duped does not work here.  First, of course,
11  none of the statements to the FDA had anything to do with
12  payment or reimbursement.  They're not material preconditions
13  to payment.  They had nothing to do with payment or
14  reimbursement.
15      Even under the promissory-fraud theory -- which, by the
16  way, Hopper says is very narrow -- but even under this theory,
17  Hendow is clear:  It has to be a material precondition to
18  payment.  These statements have nothing do with reimbursement
19  or payment.  Okay?
20      Now, how do I know that?  Well -- and, Your Honor, I
21  obviously don't have an objection to the extent these visual
22  aids will be helpful.  Obviously, the complaint allegations
23  and the documents control.
24      The relator has submitted 29 exhibits to their motion to
25  dismiss.  There are only two statements to the FDA in there.
```

1   And as Your Honor has pointed out, they are statements that

2   are part of a very long approval process and post-approval

3   monitoring.  Okay?  They have nothing to do with payment or

4   reimbursement.  They have nothing to do with claims for

5   reimbursement.  It's not just that they don't use those word,

6   although they don't.  They just -- they are statements about

7   submitting stability data.  Or, "Here's some more data for

8   your consideration."

9        And of course, Your Honor put your finger on one of the

10  big problems with this theory is it -- the theory is

11  predicated on the idea that:  Well, they wouldn't have

12  approved all these life-saving and life-preserving medicines

13  if they had known this.  Or:  Well, okay, even if they had

14  approved it afterwards, we didn't know this was all going on;

15  we would have revoked approval.

16       Okay?  And it's going to enmesh the Court -- as the Court

17  is already thinking through, it's going to enmesh the Court in

18  FDA approval and post-approval decision-making.

19           **THE COURT:**  Except, as through the examples here that

20  Mr. Friedman gives, that had the -- if you phrase it in terms

21  of not what the FDA would have done had it known after the

22  fact that the certification was false, but had there not been

23  a false certification in the first instance, they wouldn't

24  have even gotten -- there was no discretion.  There would not

25  have been an approval of the drug.

1          **MR. POSNER:**  Well, there's no support for the idea --

2     I mean, there obviously are -- the complaint, itself, details

3     a very complex drug approval process.  Okay.  It begins

4     frequently with animal testing, goes to human testing, and

5     clinical trials.

6          Your Honor is familiar -- the Code of Federal Regulations

7     and the FDA regulations detail a very complicated

8     drug-approval process with which Your Honor may be familiar.

9     There are many, many submissions that relate to that.  It is

10    true that they have nothing do with payment or reimbursement.

11    I think that's probably conceded.

12         But, Your Honor, there is no support for the idea that any

13    of those submissions -- because of course what the relator is

14    saying is all of those submissions are material, every single

15    time you submit something to the FDA as part of the approval

16    process, it's all material to get it approved, and then later

17    payment happens.

18         Yeah, it's true that none of these statements were made,

19    as Your Honor has put it, to the payor agency.  That's

20    certainly true.  But what they're saying is that every single

21    submission to get this product approved -- and as Your Honor

22    knows, that takes years, and it's all laid out in federal law

23    and regulations -- they are saying that every single one of

24    those submissions is material.

25         And there is no legal support for that, whatsoever.  It is

1    stretching the False Claims Act well past its ability to be

2    limited to claims for payment.

3         The -- the vast majority of the exhibits that have been

4    cited here, I think 27 of the 29, are internal statements that

5    move the drug along in its manufacturing process.

6         How do I know that?  Because Paragraph 34 makes that

7    abundantly clear.  Paragraph 34 says:  Well, Gilead has a very

8    complicated system for processing the manufacture of its

9    life-saving products.  There's manufacture of active

10   pharmaceutical ingredient, then maybe sometimes it goes to a

11   contract manufacturer, and there's lots of forms along the

12   way.  They lay all this out in Paragraph 34.

13        And so what they're arguing is:  It's not just that those

14   statements, Your Honor, weren't even made to the government.

15   They're arguing that it's all material.  And they're arguing

16   that, even though it had nothing to do with claims for

17   reimbursement or payment.

18        It's completely unlike *Hendow*, as I think Your Honor first

19   imagined, that these are -- they're both internal statements

20   that move the manufacturing process one step along.  And

21   Paragraph 34 says:  Well, they have this really complicated

22   process with all these forms.

23        And, we can take that as true.  And the vast majority of

24   the documents cited are those forms that move the product

25   along in the process (Indicating).  They are not even made to

1   the government.  They're internal.

2       But more importantly, Your Honor -- I mean, that would be

3   reason, alone, to not credit it.  But, they have nothing to do

4   -- how they be material preconditions for payment?  They're

5   not made to the payor, they aren't even made to any agency,

6   and it has nothing to do with reimbursement.

7           **THE COURT:**  Well, but there is a -- a causal

8   relationship between getting FDA approval, and then ultimately

9   being able to get paid for this drug by Medicare and Medicaid.

10  Because without the approval, you don't have a drug to sell,

11  and you don't get paid.

12          **MR. POSNER:**  Yes, Your Honor.  But there may be a

13  number of predicates to getting the drug paid for.  And even

14  if the approval process is an important one, and I don't deny

15  that it is, then every part of the approval -- that's exactly

16  what *Omnicare* was worried about.  That's why it said we need a

17  gatekeeper rule here, that -- I mean, it's applying the same

18  legal standard that the Ninth Circuit applies.

19          **THE COURT:**  That does raise a question.  Your

20  comeback to that, Mr. Friedman, is:  Well, look at this.  No

21  certification, you wouldn't have gotten it; we don't have to

22  guess what would have happened.

23      But there are so many things along the way.  You can

24  imagine if they just faked one test result, and not anything

25  else.  Or if they had not disclosed two or three things here,

1    but everything else was okay.  At some point, you have to

2    engage in some guesswork, right, as to what the FDA would have

3    done.

4        Or, are you carving out only the ultimate certification,

5    where there's no FDA discretion?  Is that the line where FDA

6    has no discretion, and where they have discretion?  Is

7    there -- some areas where they do have discretion, but I take

8    the after-market situation where there is a threat of recall

9    because of some disclosure about impurities.  There is

10    discretion.  You have to admit, there is a zone where we don't

11    know -- zone of conduct where we don't know how the FDA would

12    have responded.

13        How do I institutionally respond to that, as a court?

14    Where it's not so clear that -- no certification, ultimate

15    certification, no go, no approval?  There are lots of larger

16    gray areas.

17        And your rule is that:  Well, even if the

18    misrepresentation's not made to the payor but made to the

19    licensing agency, which then leads to the payor eligibility,

20    that can be an FCA claim.

21        And I'm asking you:  What about those gray areas where

22    there's -- not so clear what the FDA is going to do, would

23    have done?

24        **MR. FRIEDMAN:**  Several things, Your Honor.

25    First, there are certain discretionary aspects to FDA

1   approval, if it's relating to the efficacy of a drug or

2   something like that, and there's a debate.

3       But what we're talking about here is a certification that

4   is required, just as in *Hendow*, by statute and by regulation,

5   that the company could not make truthfully, and made falsely.

6       **THE COURT:**  I understand you're saying this is a

7   clear case, certification.  But I need to know the answer to

8   this larger question, because if we open up this door, are we

9   opening up a Pandora's box, with a slippery slope?  I have to

10  consider, as a judge, the slippery-slope problem.

11      So I'm asking you what is beyond the slope.  What if there

12  is a lie concerning efficacy?  They faked a test, and it's not

13  as quite as efficacious and they said it did, and the FDA went

14  and approved it?  Then we discover they exaggerated the

15  effect.  They didn't give a fair sampling, or something was

16  not totally disclosed.  And then, they get certificated, and

17  they get approved, they get billions of dollars from Medicare,

18  and now it's been disclosed.

19      Is that fair game for an FCA claim, once it's disclosed

20  that they lied on an efficacy test?

21      **MR. FRIEDMAN:**  I think, Your Honor, that that is a

22  factual determination ultimately, that there needs to be the

23  benefit of discovery, and there needs to be an opportunity to

24  see exactly what the nature of the misrepresentation is.

25      And here, we're not --

1    **THE COURT:**  And let's say you get that information,

2    and then you still have to determine:  What would the FDA have

3    done.

4        If there's some discretion, does the Court sitting in an

5    FCA situation, or a jury, have to ascertain and determine

6    what -- whether the FDA would have approved anyway, or not

7    approved, or done some other intermediate step?

8        **MR. FRIEDMAN:**  Well, Your Honor, if, if it was a

9    different case, I could envision a case where that might

10   create a problem of undue speculation and intrusion.

11       But here, you're talking about a certification, a very

12   specific false certification that was made with respect to

13   test results and representations to the FDA that were false.

14       With respect to materiality, *Hendow* says, you know, that

15   if you are looking at materiality, that it was an academic

16   question where the statute and regulations explicitly

17   condition participation in the program.

18       The Court said that:  Look.  If the statute, regulation

19   and agreement explicitly conditioned participation and then

20   ultimately payment on compliance with things like the precise

21   requirement of the statute, then there's not a material -- the

22   statute defines materiality.

23       **THE COURT:**  Well, what's the condition here?  The

24   condition is FDA approval.  Right?

25       **MR. FRIEDMAN:**  For -- the condition for participation

```
 1    in the Medicare program is that you have a covered drug.  And

 2    the condition for approval by FDA is that you submit a

 3    certification, and that you comply --

 4         THE COURT:  Well, what's a covered drug within the

 5    meaning of the Medicare and Medi- --

 6         MR. FRIEDMAN:  It's one that's approved by the FDA.

 7    And so, that's why there's -- this is not an indirect causal

 8    chain.  This is an absolute direct --

 9         THE COURT:  Right.  But literally, it is approved.

10    It shouldn't have been approved, arguably, but it was

11    approved.

12         MR. FRIEDMAN:  That's right.  And I would agree,

13    Your Honor, that if the question were a matter of discretion

14    as to whether it should have been approved because it was safe

15    or efficacious with respect to a new drug, that's one thing.

16      But here, where the statute requires that you get approval

17    based upon validation tests showing that with good

18    manufacturing processes, it has the same purity with respect

19    to Synthetics China, where the statute specifically requires

20    that you certify compliance with good manufacturing practices,

21    this is not a situation where it's some gray zone of

22    discretion.

23         THE COURT:  What is the misrepresentation here made

24    to the payor?  Do you claim there is a misrepresentation,

25    other than the misrepresentation to the FDA?
```

1          **MR. FRIEDMAN:**   No.   We do not say that Gilead,

2     itself, made a direct misrepresentation to the payor.   We do

3     not.

4          But, I submit that under *Hendow*, that's not -- the

5     question is not to whom the representation was made.   The

6     question is whether the representation was made, it was false

7     when made, with scienter that was material in the sense that

8     it may have influenced the government action.   And conferring

9     a benefit, which in this case is the FDA approval.

10         With respect to *Amphastar*, the Court did -- I misspoke.

11    The Court did ultimately grant the 9b portion of the motion.

12    But the Court endorsed the theory that there was false --

13    false statements under those circumstances in connection with

14    the FCA.

15         The notion that there are these other tools that would be

16    available to the FDA, that applied equally in the *Hendow* case.

17    It applies in every case in which the government has multiple

18    tools.

19         In the *Hendow* case, the government could have de-licensed

20    the facility, the University of Phoenix.   They could have

21    brought enforcement proceedings against the university.   In

22    fact, they did bring enforcement proceedings under the

23    Department of Education Act.

24         But that didn't ultimately affect the fact that the

25    relator stated a claim, and the statement of interest filed by

1  the United States government in this case makes that amply

2  clear, as to the cases cited there:  That just because the FDA

3  may have other tools available does not mean that there's not

4  a False Claims Act violation.

5      And, it certainly does not mean that the government should

6  be constrained to pay for drugs which are so contaminated they

7  never should have been approved in the first place, based upon

8  a false certification.

9          **THE COURT:**  You are asserting also in addition to

10 false certification, a worthless services or -- another

11 theory, right?

12         **MR. FRIEDMAN:**  We make a factually false --

13         **THE COURT:**  Factually false.

14         **MR. FRIEDMAN:**  -- claim as well.  That, I think,

15 Your Honor, we didn't brief that extensively because I think

16 that the more apt theories are false certification, express or

17 implied, and promissory fraud.

18     But more importantly --

19         **THE COURT:**  And the promissory fraud is -- could you

20 articulate that one more time?

21         **MR. FRIEDMAN:**  Sure, Your Honor.  If you make a false

22 certification, as Gilead did here, that you are in compliance

23 and will be in compliance, and are manufacturing and will

24 manufacture pure drugs that meet the specifications, and

25 that's false when made, and is intended to gain approval, then

1    subsequently, the product sales and payments are all tainted.

2    They're all --

3         **THE COURT:**  So that's the promissory fraud made, at

4    least in the first instance, to the FDA.

5         **MR. FRIEDMAN:**  Correct.  And I would point out,

6    Your Honor, that in *Hendow*, the court said none -- those are

7    different theories.  But the court articulated a very specific

8    four-part test that it said applied both to certification and

9    promissory fraud.  And, the elements of that test are amply

10   demonstrated here.  At all levels.

11        **THE COURT:**  All right.  Response?

12        **MR. POSNER:**  I think Your Honor can dismiss this

13   case, and write it narrowly.  Okay?  I think this is a

14   straightforward application.  I think we all agree that the

15   legal standard is a material precondition of payment.  All

16   right?

17      I don't think the Court needs to hold that no submission

18   ever to the FDA can't count.  But, the allegations here --

19   they're only a couple to the FDA -- have nothing do to do with

20   payment or reimbursement.

21      They -- it's not just that they don't have that,

22   Your Honor.  I want to come back to something that also is

23   remarkable about this case.  It's not so much that the

24   relators are conceding that there was no misrepresentation

25   ever made to the payor.  That's a significant concession.

1   But, we have more than that.  They haven't even elucidated:

2   What are the rules of reimbursement; what are the conditions

3   of reimbursement?

4       I think Plaintiffs' Counsel was almost about to talk about

5   some off-label promotion cases which he cites.  He's not -- I

6   just want to point out, Your Honor, the distinguishing factor

7   in those cases is, as the courts specifically noted there,

8   those cases are based on Medicare eligibility rules like

9   reasonable and necessary or experimental.  There are Medicare

10  rules and regulations and conditions of payment that guide the

11  courts in those cases.

12      You have none of that here.  You don't even have the

13  agreements with the United States.  You don't have the

14  Medicare agreement, the Medicaid agreement.  And that's

15  because the relator concedes that there's nothing to do with

16  manufacturing compliance in any of that.

17      And that's why this is a remarkable False Claims Act case,

18  because all of that is absent here.  It's not just that the

19  misrepresentations were made to a completely different

20  analysis.  It's not just that, you know, there is no

21  misrepresentations that are made to Medicare and Medicaid.

22  It's that you don't even have before you the basic contract or

23  eligibility reimbursement and payment rules to govern your

24  analysis.

25      And I think that's what's very unusual about this case.

1  And that's why this is a straightforward easy application of

2  the material-precondition-to-payment rule that the internal

3  documents that make up the vast majority of the exhibits here

4  have nothing to do with payment or reimbursement.  And the

5  couple of statements to the FDA have nothing to do with

6  payment or reimbursement.

7      That's an easy application to the rule.  And, obviously,

8  open -- to rule otherwise would open up every representation

9  to the FDA that was part of the approval process.

10     To the extent the relators are saying somehow that if you

11 make a mistake or you're fraud on filing No. 64, that that

12 somehow removes the discretion from the FDA, or that there's

13 more discretion or less, there's just nothing in federal law

14 that provides that.

15     There are lots of filings that make up the drug approval

16 process.  This one, they've only pointed to two among many,

17 and it has nothing to do with payment or reimbursement.

18         **THE COURT:**  Let me ask whether the government --

19 Ms. Winslow, do you have any comments to add from the

20 government's perspective?

21     I mean, I did receive the statement of interest, and I

22 want to know, since the U.S. has an interest in this --

23         **MS. WINSLOW:**  Yes, Your Honor.  Thank you.  I would

24 like to make a few short points.

25     First of all, I just want to make clear that the

government's interest here is not in this -- in the outcome of
this particular case.  And we're not commenting on the
allegations or defenses in this particular case.  But we're
interested in the -- mostly in the development of the False
Claims Act case law, which is why I'm here today.

We are the real party in interest in this case.  But
that's not why -- that is not the main purpose of what I'm
about to say.

So, from our point of view, the point isn't what the FDA
would have done if it knew about alleged misrepresentations.
It's whether the alleged misrepresentations or the alleged
defect in the manufacturing process or the alleged defects in
the drugs, themselves, were material to the federal healthcare
program's decision to pay.

And, it's not accurate that there's nothing in the
Medicare or Medicaid rules that have to do with drug
manufacturing.  There may not be anything specific to drug
manufacturing, but the federal healthcare programs will not
pay for a drug if it's not approved by the FDA.

And, it cannot be that mere FDA approval precludes any
False Claims Act liability.  For example, I mean, I can think
of a lot of -- I can give you a parade of horribles, but I'll
just throw out a few examples.

If, for example -- Your Honor talked about
misrepresentations from clinical testing.  If, for example,

 1   there were clear -- if the company tested the drug, and this

 2   clinical trial came back and said the drug doesn't work, but

 3   the company falsified the documents from the clinical trial to

 4   say that the drug did work, I don't think there's anyone here

 5   -- and the FDA then approved the drug on that basis, I don't

 6   think there's anyone here --

 7          **THE COURT:**  See, you're making the converse.  That

 8   is, not that the claim is based on FDA being duped into

 9   granting approval, but that you can have a worthless drug or

10   non-safe drug, or a dangerous drug, or a drug that doesn't

11   meet what it's supposed to do, notwithstanding FDA approval,

12   and FDA approval does not preclude - I guess it sounds like a

13   factually-false claim under the FCA.

14          **MS. WINSLOW:**  Yes, Your Honor.  And there could be

15   lies to the FDA that caused the FDA to approve a drug that are

16   so material that there's no one who could argue that the FDA

17   would have approved the drug, had it known it to be true.  And

18   if the FDA had not approved the drug, Medicare and Medicaid

19   wouldn't pay for it.

20      Another example in the manufacturing area, an extreme

21   example would be:  So the FDA approves the manufacturing

22   process, but then the company, when manufacturing the drug,

23   adds something toxic to the drug.  And it kills the Medicare

24   patients who take it.  I don't think there's anyone who would

25   argue that Medicare was -- properly paid for that drug, and

1    that that shouldn't be a False Claims Act case.

2              **THE COURT:**  All right.  So, I understand the

3    government's position that a drug can be materially defective,

4    dangerous, and if submitted for payment without disclosure,

5    that could constitute an FCA claim, even though that drug had

6    somehow gotten approval.

7         Do you have any position on the argument that committing

8    misrepresentations to the FDA in order to get approval can,

9    itself, constitute an FCA claim?

10             **MS. WINSLOW:**  Well, Your Honor, the falsity -- the

11   misrepresentation to the FDA is one thing.  But the falsity to

12   Medicare or Medicaid or whatever the paying agency is is

13   something separate.  And that's that -- that relator's counsel

14   stated that they are not alleging that there's a

15   misrepresentation to the payor.

16        But, if this were a case that the government were

17   proceeding with, our theory would likely be that there would

18   be an implied false certification to the payor, that was

19   caused by the drug manufacturer.  It's made by whatever entity

20   or individual that's getting payment from Medicare and

21   Medicaid.

22        And that's the theory that the government has pursued and

23   the courts have endorsed in the off-label marketing arena.

24             **THE COURT:**  All right, but we have, I think, a

25   concession that there is no claim of a misrepresentation

```
 1    direct to the payor in this case.

 2              MS. WINSLOW:  And I don't think that there are any --

 3    any communications between a drug company and Medicare and

 4    Medicaid, typically.  But, the False Claims Act covers false

 5    claims and false statements that the defendant causes to be

 6    made, not just the direct statements and claims that the

 7    defendant makes, itself.

 8              THE COURT:  So what was caused here?  What is the

 9    causation?

10              MS. WINSLOW:  So here, just again, speaking in the

11    abstract and not about these particular facts, a drug

12    manufacturer that, say, put something toxic in the drug that

13    was not approved in the FDA approval process, then provides

14    the drug to a pharmacy or a hospital or an individual that

15    then bills Medicare.  The individual or hospital or pharmacy

16    that's billing Medicare is impliedly certifying to Medicare

17    this drug is valid, it is approved by the FDA, it is valid for

18    reimbursement.

19         The manufacturer that put the toxic substance in the drug

20    caused the biller to impliedly make a false certification.

21    And that --

22              THE COURT:  And the false certification has to do

23    with the safety of the drug?

24         What is the false certification by the biller?

25              MS. WINSLOW:  It could be the safety; it could be the
```

```
 1  efficacy.  Whatever the defect is.  If it's something toxic,
 2  it would --
 3           THE COURT:  And that's implied.  It's not expressed.
 4           MS. WINSLOW:  Correct, Your Honor, because the biller
 5  doesn't sign something saying "This is FDA approved and
 6  payable."
 7      But that's exactly what happens in the off-label marketing
 8  cases, such as the Scios case that we cited in our brief that
 9  Judge Breyer decided.
10      The drug manufacturer isn't the one billing Medicare.  In
11  that case, it was doctors and hospitals that were billing
12  Medicare.  But, it's the drug manufacturer that caused the
13  billers to make an implied certification to Medicare that
14  these drugs were proper to be reimbursed.
15           THE COURT:  Because they're being used not for the
16  purpose alleged?
17           MS. WINSLOW:  Correct.  Well, they're being used not
18  for a reimbursable purpose.
19           THE COURT:  Let me clarify from you, Mr. Friedman,
20  you have heard the government's view, but it sounds like
21  you're not making that claim here.
22           MR. FRIEDMAN:  Your Honor, when I responded -- I was
23  attempting to respond to your direct question, which is
24  whether we claim that Gilead, itself, made false
25  representations to the payor.
```

1      Ms. Winslow is absolutely correct that a statutory scheme

2   applies where the defendant caused another to submit a false

3   claim.

4      And, in this case, just by way of example, if it turned

5   out, and we allege, for example, that certain of these drugs

6   contain arsenic, which is poisonous, if we ultimately prove at

7   trial that there were drugs that were tainted in that fashion,

8   that did not comply with the FDA approval, that Gilead

9   intentionally released into commerce knowing and intending

10  that the pharmacies and physicians who are prescribing the

11  drug or selling the drug under those circumstances, that that

12  is within the statutory language that says if you cause --

13  knowingly cause another to submit an express or implied false

14  claim for payment, that's actionable.

15      **THE COURT:**  So, what is the false claim that these

16  are -- impliedly that these are -- sort of like a warranty of

17  merchantability, that these are safe drugs?

18      **MR. FRIEDMAN:**  Well, again, it would be a

19  situation -- the question really boils down to -- comes back

20  to materiality.  And with respect to that type of claim, what

21  was -- was the drug materially lacking in quality, purity, or

22  efficaciousness, such that the approval, when granted, Gilead

23  knew that that tainted product was going to be --

24      **THE COURT:**  Let's say everything was fine, but after

25  the approval, they put arsenic in there.  Is there a false

1    claim there?

2           MR. FRIEDMAN:  I would certainly say yes.

3           THE COURT:  So, what is the false representation?  Is

4    it based on an implied representation that:  Our product is

5    safe?  Is that the basis?

6           MR. FRIEDMAN:  Implied representation that the

7    product conforms with the conditions on which approval was

8    granted, which include that it will be produced in conformance

9    with good manufacturing practices.  And, that it will be free

10   -- be non-adulterated.  It won't be contaminated.

11          THE COURT:  All right.  Do you have any dispute that

12   the drugs were -- were -- put aside --

13          MR. POSNER:  Right.

14          THE COURT:  -- the fraud and inducement and all that

15   sort of stuff, promissory fraud.  But just, you know,

16   adulterated drugs.  They knew it, after approval process, they

17   sold a bunch of adulterated drugs.

18          MR. POSNER:  Well, I mean, *Omnicare* literally holds

19   that -- the products that violate the good manufacturing

20   practices, I think the United States would say, by definition,

21   are adulterated.

22      The Fourth Circuit already held that adulterated products

23   -- the mere fact that they are adulterated is not enough to be

24   a violation of the False Claims Act.  May violate other

25   statutes.  You may get a warning letter; you may get the

```
 1   Justice Department investigating; you may get lawsuit --

 2            THE COURT:  You don't buy into the implied warranty

 3   that when a drug manufacturer sells drugs to a pharmacy that

 4   seeks reimbursement from Medicare, knowing it is

 5   non-efficacious or they substituted a placebo -- let's go to

 6   that extreme.  It's a fake.  You say there's other remedies,

 7   but no False Claims Act.

 8            MR. POSNER:  A couple of points.

 9        (Reporter interruption)

10            MR. POSNER:  Sure.

11        The answer is yes, I dispute that.  The Ninth Circuit has

12   never recognized that kind of implied-false-certification

13   case.  Number one.

14        Number two, the United States asserts in its brief that:

15   Well, anything that affects sort of the strength or stability

16   or purity might be enough.  And they cite for that

17   proposition, one case.  And they cite the *Hendow* cause for

18   that.

19        Now, there may be cases that support that proposition.

20   But *Hendow* -- and I'm not aware of any, but *Hendow* is most

21   definitively not one of those cases.  There is no support in

22   this district or in this circuit for such a hazy

23   implied-certification case.

24        Now, then, Your Honor asked me a separate question.  There

25   -- there -- you know, there are some very, very narrow cases
```

that deal with what are called "worthless services."  All
right?  I don't -- I don't take the relator -- maybe the
relator's arguing that now; I'm still not sure.  They've not
argued that -- that's not a theory of their complaint, which I
think is the operative document.

You know, if you -- if you sell something that's
completely worthless, there -- you know, the cases really
cabin something like that.  As the Seventh Circuit famously
said earlier this year:  The product can't be worth less.  The
product has to be essentially completely worthless.  There's
essentially no support within the Ninth Circuit for this
theory.

But even if there would be, Your Honor, A, the relators
have never alleged this kind of theory, because it would
require them to show the product was completely not
efficacious, which is counter-factual, since millions of
people have taken these products and millions of lives have
been enhanced and saved.

There's no evidence, Your Honor, that the government
purchased or reimbursed any of these batches that were
supposedly worthless, all right?

You know, the few cases on this have also injected Rule 9
specificity principles into this.  You know, you can't just
say:  Well, this batch had some problems in some specs, so you
know what?  I think they all have these problems.  And you

1    know what?  They were all worthless.

2         And the courts say this is a very narrow theory.  I don't

3    think Your Honor has to rule on this.  In fact, in *Omnicare*,

4    the Court said "I don't..."  I think both the District Court

5    and certainly the Fourth Circuit said, "I don't need to go

6    there."  All right?

7         And I don't think you need to rule on that, either.  I

8    think Your Honor can write a very narrow holding.  I don't

9    think -- to the extent the government is arguing for some

10   really broad implied-false-certification standard, there's no

11   support for that in this circuit, and *Hendow* is certainly not

12   support for that.

13        I don't think Your Honor can straightforwardly apply the

14   material-precondition-to-payment standard on these particular

15   allegations.  You know, the relators are not asserting, I

16   don't believe, a worthless-services doctrine.  There is no

17   need for the Court, I think, to consider that.  It's very

18   narrow and cabined.

19        And, you know, you'd have to show which particular lots --

20   you have to trace it to lots the government bought or

21   reimbursed.  You'd have to show that they were completely

22   worthless.  And the Rule 9(b) principles would apply as I

23   think other courts have.  So I think Your Honor can write this

24   very narrowly.

25             **THE COURT:**  All right.  I'm going take the matter

1    under submission at this point, and study the cases a little

2    more carefully.

3        Thank you.

4            **MR. POSNER:**  Thank Your Honor.

5            **MR. FRIEDMAN:**  Thank you, Your Honor.

6            **MS. WINSLOW:**  Thank you, Your Honor.

7        (Conclusion of Proceedings)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United

States Court, Northern District of California, hereby certify

that the foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.

/s/  Belle Ball_____

Thursday, October 30, 2014

Belle Ball, CSR 8785, CRR, RDR